Farmers National Bank of Bloomsburg
*v*. Albertson et ux., Appellants.

206

Argued March 2, 1964.   Before RHODES, P. J.,
ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY,
and FLOOD, JJ.

*Herbert L. Winkler,* with him *Patrick J. Toole,
Jr., Thomas J. Evans,* and *Winkler, Danoff, Lubin &
Toole,* for appellants.

*Gailey C. Keller,* with him *Hervey B. Smith,* and *Smith, Eves and Keller,* for appellee.

OPINION BY WOODSIDE, J., April 14, 1964:

This is an appeal from a decree of the Court of Common Pleas of Columbia County, sitting in equity, imposing an equitable lien of $2,194.16 upon certain real estate owned by the defendants.

The credibility of the witnesses, who gave conflicting testimony, was for the trier of the facts. A chancellor's findings of fact, approved by the court en banc, have all the force and effect of a jury's verdict if supported by adequate evidence. *Kallen v. Pollock,* 412 Pa. 281, 284, 286, 194 A. 2d 227 (1963). Viewed in this light, the facts are as follows:

The defendants owned and resided on a farm, a part of which was laid out in lots. Their son, W. A. Albertson, hereinafter called Albertson, erected a garage on lots numbered 11 and 12 of his parents' farm to store and repair the equipment used in his business of earth moving. Thereafter, on May 13, 1950, Albertson's parents conveyed to him lots 10, 11 and 12. One week later, on the day the deed was recorded, Albertson took it to The Farmers National Bank of Bloomsburg, Pa., hereinafter referred to as bank, and made application for a loan for the purpose of constructing a dwelling house on lot 10. On the same day, the bank entered a note against him for $5,000, and starting that day made periodic payments to him while he was constructing the house. On October 27, 1950, the bank entered a second note against him, this one for $2,000. On November 6, 1950, an additional $3,000 was paid Albertson and a mortgage for $10,000, representing a consolidation of all his debts to the bank as of that date, was given by him to the bank covering lots 10, 11 and 12, on which the house was believed to have been constructed. Actually, Albertson had not built the

house on lot 10, but on lots 8 and 9, title to which remained in his parents, the defendants herein. A policy insuring the house for $12,000 contained a loss payable clause in favor of the bank.

Prior to making the loan application of May 20, 1950, Albertson borrowed from the bank but always with his father's endorsement on the notes. The bank continued to make numerous loans to Albertson after the date of the mortgage. Albertson's father also made numerous loans to him both before and after the construction of the house, and assisted him with the construction of the house in the sum of $4,916.48.

The bank did not discover that the house had been constructed on lots 8 and 9 until 1954. It then requested, but did not receive, payment of the loan or additional security.

In January 1961, when the principal and interest due on the mortgage were in default, the bank issued execution and had lots 10, 11 and 12 with the garage sold at Sheriff's Sale. Later, it obtained a deficiency judgment against Albertson for $4,875.84 with interest from September 30, 1960. The bank then brought this action in equity to impose a lien for its total claim of $6,209.19 upon the lots of the defendants on which the house was constructed. The court, for reasons not here important, held that the maximum allowable as an equitable lien was $2,194.96, which it imposed upon lots 8 and 9 and the house thereon erected.

The defendants claim that the erection of the house on their land was a mutual mistake of their son and the bank and that they had no knowledge that it was on their land or that their son had borrowed from the bank to build it until several years after it had been erected. They lived on the farm only a quarter of a mile up the road from the house, but they said they were "out West" when the house was built. Albertson had discussed with his father the financing of the con-

struction of his house before building it, and his father agreed to help him. Albertson's father was signing notes for him and making good checks given by him with insufficient funds in the bank shortly before the erection of the home was started. The defendants transferred lots 10, 11 and 12 to their son only a week before the first construction loan was made. The court below was satisfied that the father despite his denial was familiar with his son's financial condition and knew he had to borrow to build the house. The court concluded that the father had or should have had knowledge that his son was borrowing money from the plaintiff for the purpose of constructing the house, and that the defendants remained mute while their son built an expensive home on their land with the plaintiff's money. The court found that the defendants made no claim to the home erected by their son until he had become hopelessly and deeply indebted to the defendants.

Although the bank had title to the lots searched prior to accepting the mortgage, it had no indication that the house was not built on lot 10. The court below found that "W. A. Albertson thought he was building his home on lot 10 which is in accord with the representations he made to the president of the plaintiff bank. The lot boundaries were not marked by any monument on the ground. There is a dispute as to the actual starting place for the laying out of the lots and the presence of a stream to the north of lot 12 makes the mistake readily understandable. The Shulde draft mentioned in deed marked defendants' Exhibit No. 7 fails to clearly show anything that would give the exact location of the lots. When the defendants employed a different surveyor in 1961, they were not satisfied with his resurvey of January 6th and interpretation of the Shulde draft. The insurance policy of October 6th, 1950, on the house also indicates W. A. Albertson thought he built his home on his own land."

The court below also said: "We think Earl E. Albertson [the father] had or should have had this knowledge. The defendant was well acquainted with his son's financial difficulties. As early as July 1, 1949, the defendant endorsed his son's obligations at the plaintiff bank. . . . He knew his son's operations were not paying off because he was continuously being required to come to his son's financial assistance. These facts must have certainly put him on notice that his son had no capital with which to construct an expensive home."

On the question of fraud, the court had the following to say: "In weighing the testimony of the parties, we found much to be desired to show a guarantee of truth to many of the claims made by the defendant, Earl E. Albertson, as well as that of the son, W. A. Albertson. As stated in our adjudication, fraud can be passive as well as active. It can be effected by acts of omission as well as acts of commission. This is especially true where the conduct of the parties creates a duty on another party to speak and that party remains silent. In our opinion, defendant's illness and western trip did not excuse him from telling the plaintiff bank that his son's house was being constructed on defendant's land. Nor did the fact that defendant was also contributing to the construction, because his contributions of less than $5,000.00 toward a house costing more than double that amount, plus knowledge of his son's poor financial condition must have put him on notice that the plaintiff bank was also furnishing money for the construction."

By the time this suit was brought Albertson had become indebted to his parents for a considerable sum and had assigned to them all his business equipment and had surrendered possession to his parents of the house in question which the court below found to be worth more than twice the $5,000 which his parents had put into it.

If the parents were unjustly enriched, equity has the power to fix a lien upon the property. *General Pulaski Building & Loan Association v. Provident Trust Co. of Phila.,* 338 Pa. 198, 202, 12 A. 2d 336 (1940). Where one party has been unjustly enriched at the expense of another, he is required to make restitution. In order to recover, there must be both an enrichment and an injustice resulting if the recovery for the enrichment is denied. *Meehan v. Cheltenham Twp.,* 410 Pa. 446, 449, 189 A. 2d 593 (1963).

Ordinarily, where one in possession of land which he mistakenly believes that he owns builds a house thereon, he is not entitled to restitution from the owner of the land. Restatement, Restitution, §42(b) and Illustration 1 on page 170. As the comment on this section in the Restatement indicates, the rule is harsh and not wholly consistent with the principles for restitution for mistake. Its harshness has been substantially relieved, in most cases, either by statute or by equity in case of land. p. 168.

There is not only the close family relationship, but there was also a close financial relationship between Albertson and his parents. The defendants were enriched by obtaining title to a house worth more than $10,000 which was built largely from money advanced by the bank believing that it was built on Albertson's lot conveyed out of his parents' farm.

As in *Gladowski v. Felczak,* 346 Pa. 660, 663, 664, 31 A. 2d 718 (1943): "The crucial fact is that the mortgage money was used wholly for the benefit of the property which has now been restored to the ownership and possession of the [defendants]. . . . The object to be attained is the prevention of the unjust enrichment of defendants and the securing for plaintiffs of that to which they are justly and in good conscience entitled."

On questions of this nature no two cases are alike. Each case rests upon its own peculiar facts and the

general equitable principles relative thereto. The case of *Gladowski v. Felczak,* supra, is closer to the matter before us than the three cases relied upon by the defendants. In *Western Pennsylvania National Bank v. Bradish,* 194 Pa. Superior Ct. 126, 166 A. 2d 104 (1960), the chancellor found that "there was no intention on the part of the bank to impress the lien of the judgment note signed by Bradish on the property" on which the plaintiff was attempting to impose the lien. In *Meehan v. Cheltenham Township,* supra, 410 Pa. 446, 189 A. 2d 593 (1963), the court found that the financial benefit to the municipal corporation was not clear. *Lauffer v. Vial,* 153 Pa. Superior Ct. 342, 33 A. 2d 777 (1943), was an action in assumpsit.

In light of the facts found by the chancellor and approved by the court after passing upon the exceptions and of the general recognized principles of equity, we think the defendants were enriched by several times the amount of the lien imposed by the decree and that it would be unjust for the defendants to be permitted to retain the house in question free and clear from all encumbrance when it was built largely from funds supplied by the bank.

Decree affirmed.